UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA/SACRAMENTO

```
UNITED STATES OF AMERICA,   )
                            )
     Plaintiff,             )
                            )
v                           )   Case No. 2:07-CR-0024 DLJ
                            )
ARTEMIOS MANIATIS, et al.   )   ORDER
                            )
     Defendant.             )
_____)
```

On May 4, 2007, Defendants Artemios Maniatis and Dimitrios Georgakoudis filed a motion to suppress statements that they made to the United States Coast Guard (Coast Guard) on November 2, 2006 when the Coast Guard boarded the M/T Captain X Kyriakou in Benicia, California.  In their motion, Defendants argue that their statements were obtained in violation of their Fourth and Fifth Amendment rights because the Coast Guard intentionally mislead Defendants into believing that the Coast Guard was conducting a random, administrative inspection, when, in fact, the Coast Guard boarded the ship to gather evidence for a criminal investigation. The Court held an evidentiary hearing on Defendants' motion on November 15, 2007.  Having read the parties' papers, heard argument by counsel and reviewed the applicable law, the Court DENIES defendants' motion to suppress for the reasons that were stated at the hearing and set forth below.

**FACTUAL BACKGROUND**

On November 2, 2007, at approximately 9:45 a.m. Port State Control inspectors from the Coast Guard boarded the Captain X Kyriakou (hereinafter *the vessel*) in the Port of Benicia.  A Port State Control Inspection is an examination of a foreign vessel

entering a United States port to ensure that it is in compliance with applicable United States and international law and regulations.  The inspection generally includes a review of the vessel's flag state documents, Oil Record Book and life saving and safety equipment.  Prior to boarding the vessel, the inspectors were notified by their supervisors that the Coast Guard's National Response Center had received a telephone call from a crew member of the vessel stating that he had been ordered to use a bypass pipe, also known in the maritime world as a "magic pipe", which can be used to bypass pollution control equipment and to discharge oily waste directly into the ocean.

Once on board the vessel, the inspectors proceeded to the Ship Master's office where a member of the Port State Control inspection team, Charles Curtian, informed the Master that Port State Control inspectors were on board to conduct a "random" inspection and that the vessel could continue unloading its cargo.  The inspectors began their inspection by reviewing the vessel's Flag State documents, Safety of Life at Sea (SOLAS) documents, and other records.  After inspecting these documents, several inspectors proceeded to the engine room of the vessel where they examined the bilge spaces, incinerator, Oily Water Separator and other equipment and spoke to Chief Engineer Artemios Maniatis and First Engineer Dimitrios Georgakoudis.  During the course of their inspection, the inspectors noticed a crew member signaling them.  The inspectors attempted to split up their inspection so that they could make contact with the individual signaling them without attracting

1  attention from the other crew members.  The inspectors eventually
2  made contact with Farley Mendoza, who informed them that he was the
3  crew member who had contacted the Coast Guard and indicated that he
4  had hid the bypass pipe in a venting system.  Based on this
5  information, the inspectors conducted a search for the alleged
6  bypass pipe but were unable to locate it.  Inspector Charles
7  Curtian subsequently informed the Chief Engineer that there had
8  been allegations of the use of a bypass pipe on the vessel.
9  Maniatis denied that such a pipe was ever used and stated that
10 there were unhappy crew members who wanted to go home and that he
11 believed they had made up the story about the use of a bypass pipe.
12 Coast Guard inspectors subsequently informed the vessel's master
13 that the ship was being detained because of suspected MARPOL (an
14 international treaty regulating pollution at sea), violations.

15     In their motion, Defendants argue that the Coast Guard
16 unlawfully used an administrative proceeding, the Coast Guard's
17 Port State Control inspection, to gather evidence for a criminal
18 investigation.  Additionally, Defendants suggest that because the
19 Coast Guard possessed information regarding allegations of the use
20 of a bypass pipe from their contact with Farley Mendoza, they
21 should have informed Defendants that there was an ongoing criminal
22 investigation.  Defendants also allege that the Coast Guard
23 affirmatively misled them by stating that the inspection was
24 random, when, in fact, their inspection was initiated because of
25 the allegations about the use of a bypass pipe on the vessel.
26 Defendants argue that had they known that there was an ongoing

3

1  criminal investigation they would have not made statements to the
2  Coast Guard.  As support for these arguments, Defendants
3  principally rely on <u>United States v. Stringer</u>, 408 F.Supp. 2d. 1083
4  (D. Or. Jan. 9, 2006).  <u>Stringer</u> is a district court where the
5  court dismissed an Indictment because it found that the United
6  States Attorney's Office had used an SEC civil investigation to
7  gather evidence for its criminal investigation.  Defendants also
8  cite <u>United States v. Robson</u>, 477 F.2d 13 (9th Cir. 1973) for the
9  proposition that a defendant's due process rights are violated if
10 the government uses trickery or deceit regarding the existence of
11 criminal proceedings.

**Discussion**

13 The Court denies Defendants' motion to suppress because: (1)
14 Coast Guard inspectors were under no duty to inform Defendants
15 about potential criminal liability that might flow from the Port
16 State Control inspection, and there is no evidence that inspectors
17 affirmatively misled them and (2) there is no evidence that
18 criminal investigators or prosecutors used the Port State Control
19 inspection as a guise to gather evidence for a criminal case.

20 There is no legal support for Defendants' suggestion that the
21 Coast Guard should have informed Defendants about the possible
22 criminal consequences of their inspection and there is no factual
23 evidence to support Defendants contention that the Coast Guard
24 affirmatively misled them.  In <u>United States v. Robson</u>, 477 F.2d at
25 16, the Ninth Circuit addressed whether a government agent has a
26 duty to inform an individual of the criminal implications of a

4

civil or administrative inquiry.  In that case, the defendant moved to suppress evidence that was obtained by an IRS audit official who was, based on information from a tip supplied to IRS criminal investigators and passed on to auditors, was auditing the defendant.  <u>Id</u>. At 15.  The defendant argued that because the IRS audit official never informed him that the audit might lead to potential criminal proceedings, any information that he provided during the audit must be suppressed.  <u>Id</u>.  The court held that while a government agent must not affirmatively mislead a defendant into believing an investigation is entirely civil in nature, absent some custodial setting, it is under no duty to advise an individual that an inquiry might have criminal consequences.  <u>Id</u>. at 16.  The Court noted that this general rule is still applicable even though the IRS was conducting an audit based on a tip provided to the IRS criminal division.  <u>Id</u>.

    The facts of this case are similar to <u>Robson</u>, where the court denied defendant's motion.  The Coast Guard received a tip about the use of a bypass pipe on the vessel and proceeded to conduct a Port State Control inspection based, in part, on that information.  There is no evidence, nor do Defendants' argue, that they were subject to custodial interrogation and accordingly, the Coast Guard was under no duty to inform them that the Port State Control inspection was initiated as a result of a tip or that criminal liability might arise from statements made during the Port State Control Inspection.  It should also be noted that Port State Control Inspections are authorized and are routinely conducted

1  whether or not the U.S. Coast Guard has received a "tip" about
2  possible misconduct.
3      There is also no evidence that Coast Guard inspector Charles
4  Curtian intentionally and affirmatively mislead Defendants' when he
5  stated that the Coast Guard was conducting a "random" inspection.
6  As Curtian explained at the evidentiary hearing, the Coast Guard
7  cannot inspect every foreign vessel coming into port and therefore
8  uses a point system to prioritize its inspection of foreign
9  vessels.  Under this system, vessel's are classified as priority
10 one, priority two, or non-priority.  Priority one and priority two
11 vessels are automatically inspected and non-priority vessels are
12 inspected on a random basis.  The inspection was therefore "random"
13 as Curtain indicated because under the Coast Guard's system the
14 vessel was classified as a non-priority vessel, subject only to
15 "random" inspection.  Additionally, Defendant's reliance on <u>Robson</u>
16 is misplaced.  The <u>Robson</u> court cautioned against affirmatively
17 misleading individuals by stating that an investigation was
18 "exclusively civil."  <u>Id.</u> 18.  Stating that an inspection is
19 "random" does not imply that the inspection is exclusively civil in
20 nature.  Defendants do not allege, nor is there any evidence, that
21 Curtian made statements that characterized the investigation as
22 exclusively civil or informed Defendants' that criminal liability
23 could not flow from the Port State Control inspection.
24     Defendants also argue that their statements must be
25 suppressed because the Coast Guard used the Port State Control
26 inspection to gather evidence for a criminal investigation.  As

6

support, Defendants rely on <u>United States v. Stringer</u>, 408 F. Supp. 2d 1083.  In that case the district court dismissed an Indictment because it found that the US Attorney's office used an SEC civil investigation to gather evidence for its criminal case.  <u>Id.</u> at 1088-89.  The court found that shortly after the SEC initiated its investigation, the US Attorney's office and FBI met with the SEC and indicated that the defendants were targets of a criminal investigation and asked the SEC to provide their investigative files to the FBI and U.S. Attorney's office.  <u>Id.</u> at 1087.  Instead of initiating parallel investigative proceedings, the FBI and U.S. Attorney's office abated their criminal investigation and used the SEC civil investigation to gather statements and documents for their criminal investigation.  <u>Id.</u> at 1088.  The US Attorney's office remained actively involved in the SEC investigation by discussing investigative strategy with the SEC and directing the SEC on how to create the best possible record for a criminal false statements case.  <u>Id.</u> at 1088.  The court also noted that the SEC actively concealed the fact that they were working with the US Attorney's office by giving evasive and misleading answers when defendants attorneys asked if the SEC was working with criminal investigators.  <u>Id.</u> at 1089.

   Even if Stringer were a case which this Court was bound by, its facts are readily distinguishable from those in the instant case.  Unlike in <u>Stringer</u> where the US Attorneys office was involved in directing and advising the SEC investigation, there is no evidence that the US Attorney's office or criminal investigators

7

directed or were in any way involved with the Coast Guard's Port State Control inspection. Charles Curtian testified at the evidentiary hearing that Port State Control inspectors did not have any contact or conversations with criminal investigators from the Coast Guard Investigative Service or the US Attorney's office before inspecting the vessel. The Coast Guard's timeline, which Defendants' introduced at the evidentiary hearing, indicates that the Coast Guard Investigative Service and the US Attorneys office did not become involved in the investigation until after the Port State Control Inspection uncovered potential MARPOL violations.

**CONCLUSION**

For the reasons stated above, the Court DENIES Defendants' motion to suppress.

IT IS SO ORDERED

June 20, 2007

_____
D. Lowell Jensen
United States District Judge